UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QUINTON STROUD,

               Plaintiff,                CIVIL ACTION NO. 10-12515

        v.                      DISTRICT JUDGE JULIAN ABELE COOK

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

###     *A.    Proceedings in this Court*

On June 24, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance and Supplemental Security Income Benefits (Dkt. No. 3). This matter is currently before the Court on cross-motions for summary judgment (Dkts. Nos. 9, 14).

###     *B.    Administrative Proceedings*

Plaintiff filed the instant claims on February 23, 2004, alleging that he became unable to work on August 22, 2003 (Tr. 32-33). The claim was initially disapproved by the Commissioner on July 21, 2004 (Tr. 83-87). After the Social Security Administration denied Plaintiff's applications, an Administrative Law Judge (ALJ) held a hearing in October 2005, at which Plaintiff, a friend of

Plaintiff's, and a vocational expert testified (Tr. 503-22). The ALJ issued his decision on March 13, 2006, and found that Plaintiff had the residual functional capacity (RFC) to perform light work, that Plaintiff could perform his past work as an assembler and therefore was not disabled (Tr. 387-90).

On March 12, 2007, the Appeals Council remanded this matter to the ALJ with instructions to consider more fully the opinions of both treating and non-examining sources, to evaluate Plaintiff's alleged mental impairments, and to further evaluate Plaintiff's subjective complaints (Tr. 406-08). The Appeals Council explained that the ALJ could obtain new evidence, if necessary, including additional expert testimony (Tr. 407-08). The ALJ then held a second hearing in September 2007, at which Plaintiff, his friend and another vocational expert testified (Tr. 523-37). The ALJ issued a new decision on December 20, 2007, finding that Plaintiff could perform unskilled sedentary work and, thus, was not disabled (Tr. 32-38). Plaintiff requested a review of this decision on January 28, 2008 (Tr. 24). The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1, Tr. 490-496), the Appeals Council, on April 29, 2010, denied Plaintiff's request for review (Tr. 8-10).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff was not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 39 years old as of the date of his alleged onset of disability (Tr. 32). Plaintiff has past relevant work as an assembler, which is defined as unskilled to semi-skilled light work (Tr. 36). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since 2003 (Tr. 37). At step two, the ALJ found that Plaintiff had the following "severe" impairments: HIV positive with complaints of depression, chronic fatigue, frequent bouts of diarrhea and occasional nausea. *Id*. At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. *Id.* Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "the exertional and nonexertional requirements of unskilled sedentary" work (Tr. 37). At step four, the ALJ found that Plaintiff could not perform his previous work as an assembler. *Id*. At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of unskilled sedentary jobs (Tr. 38).

### B.    *Administrative Record*

#### 1.    **Hearing Testimony**

Vasha Robert Gaines, a colleague of Plaintiff's at Ford Motor Company, testified at the October 2005 hearing (Tr. 507-13). Mr. Gaines explained that the doctor at Ford would not let Plaintiff work because his T-cell count was too low, having dropped to 47 (Tr. 508). Mr. Gaines testified that Plaintiff speculated about death, was argumentative, and wanted to be left alone (Tr. 511).

Plaintiff testified at the first hearing that he was born on October 31, 1963, and for 11 years did assembly work and gear cutting for Ford Motor Company (Tr. 513-14). He last worked on August 22, 2003, and stopped working because of fatigue and diarrhea (Tr. 514). Plaintiff admitted

-3-

to a history of drug use, which he explained started in his late teens and got heavier when he was in his 30s (Tr. 514-15). Plaintiff claimed he had not used drugs since December 2004 (Tr. 515). Plaintiff testified that he first tested HIV positive in 1994 but did not begin treatment until 1996 (Tr. 515-16). From 1996 until 2003, Plaintiff continued to work while on an HIV drug regimen (Tr. 516). Plaintiff explained he was depressed about his health and had trouble sleeping at night (Tr. 518). Plaintiff stated that he was going to see a surgeon for scrotal pain from a lymph node swelling in his groin (Tr. 519). Plaintiff stated that he had trouble focusing and was constantly exhausted, which made doing household chores difficult (Tr. 520).

A vocational expert testified at the first hearing that Plaintiff's past work was light and semi-skilled (Tr. 521). According to the vocational expert, Plaintiff could continue to perform this work if he could stand and work with 20 pounds (Tr. 521-22).

At noted earlier, this matter was remanded by the Appeals Council for a second hearing. Plaintiff's friend, Mr. Gaines, also testified at the second hearing, held after remand (Tr. 525-30). Mr. Gaines explained that, as of January 2006, he became Plaintiff's live-in care giver (Tr. 526). Mr. Gaines reported that Plaintiff had diarrhea and vomited daily (Tr. 527), that Plaintiff was depressed and that Plaintiff had trouble concentrating (Tr. 527). Mr. Ganies stated that Plaintiff did not participate in outside activities (Tr. 527) and that Plaintiff had trouble bathing himself because of joint pain and neuropathy (Tr. 528).

Plaintiff testified at the second hearing that he had been HIV positive since 1987 and that his HIV medicine caused diarrhea (Tr. 530, 531). Plaintiff explained that Ford Motor Company fired him for excessive absences and that Ford did not accept his explanation of diarrhea (Tr. 531). Plaintiff claimed his diarrhea was daily and constant and his medication made him tired (Tr. 531, 532). Plaintiff stated that his feet constantly burned and tingled because of neuropathy, and his legs ached from his knees to his shins (Tr. 533). Plaintiff claimed that he was depressed and had trouble

-4-

focusing (Tr. 533). Plaintiff reported that he received treatment for depression but also had panic problems – feelings of being overwhelmed when he went out of the home (Tr. 534). Plaintiff stated that he tried to commit suicide in 2002, shortly after his brother's death (Tr. 534).

A vocational expert also testified at the second hearing (Tr. 535-37). According to this expert, if Plaintiff could perform unskilled nonindustrial sedentary jobs, he could perform such jobs as information clerk, video surveillance monitor, telephone solicitor, and identification clerk (Tr. 536).

### 2.   Medical Evidence

Plaintiff tested positive for the human immunodeficiency virus (HIV) (Tr. 200). The record is unclear when Plaintiff first tested positive for the HIV because he gave inconsistent onset dates to different doctors. For example, he told a physician at Mission Health that he was diagnosed as HIV positive in 1996 (Tr. 201). Yet, a researcher noted Plaintiff first tested positive in 1986 (Tr 263). A doctor who performed a consultative examination in 2003 noted that Plaintiff informed him he first tested positive in 1994 (Tr. 278).

Plaintiff was diagnosed with Hepatitis B in 1983 (Tr. 201). He first had shingles in 1994 (Tr. 201). Plaintiff chose not to pursue treatment when first diagnosed with HIV, deferring antiretroviral therapy (ART) until February 1998 (Tr. 268, 273). He reported a history of diarrhea (Tr. 262), which he attributed to a side effect of his medication (Tr. 217). He also indicated that his ART produced recurrent nausea and vomiting (Tr. 329). Plaintiff benefitted from treatment. According to a

consultative examination report from July 1998, Plaintiff's CD4 count was 125 (Tr. 217).[2]  His viral load was 3,500 (Tr. 217).[3]

By September 2000, Plaintiff's viral load was below 200 (Tr. 243-44).  Plaintiff discontinued his ART regimen in December 2001 (Tr. 339), but restarted in January 2002 (Tr. 336).  He reported to a consultative examiner in February 2003 that his viral load had increased to 40,000, although this count was still lower than when he began treatment, for in 1996, his CD4 count was only 45 and his viral load was 120,000 (Tr. 282).  Despite his history with the virus and varying viral load and CD4 counts, Plaintiff had never been hospitalized or sent to the emergency room on account of his HIV (Tr. 282).

Plaintiff has a long history of drug and alcohol abuse.  In June and July 2003, Plaintiff completed an inpatient detoxification program (Tr. 298-303).  According to the discharge report, prior to admission, Plaintiff was spending $150 daily on crack cocaine (Tr. 298).  He first started drinking alcohol when he was four years old, and began drinking heavily at age eight (Tr. 300).  He started using powder cocaine at 19, and crack cocaine at 22 (Tr. 300).

In addition to drug and alcohol abuse, Plaintiff had a history of depression dating to 1998 (Tr. 215).  In 2003, Plaintiff told an examining psychiatrist that he attributed his depression to having HIV (Tr. 278).  He told the psychiatrist that he had never been admitted to a psychiatric hospital and

---

[2]  The CD4 laboratory blood test measures the number of CD4 cells in a sample of a patient's blood, in order to assess the status of the immune system. CD4 cells are part of the body's immune system. CD4 cells help identify, attack, and destroy bacteria and viruses that enter the body.  However, when a patient is infected with HIV, the HIV infects and kills the patient's CD4 cells.  Thus, as a patient's HIV infection progresses, the CD4 count may decrease.  Accordingly, the CD4 count can be used to evaluate and track the progression of HIV infection and disease.  *See Underwood v. CMS*, Case No. 09-10448, 2011 WL 692164, FN 2 (E.D. Mich., Jan. 13, 2011) (citing: www.labtestsonline.org).

[3]  HIV viral load tests are reported as the number of HIV copies in a milliliter (copies/mL) of blood. If the viral load measurement is high, it indicates that HIV is reproducing and that the disease will likely progress faster than if the viral load is low. During treatment and monitoring, a high viral load can be anywhere from 5,000 to 10,000 copies/mL. Initial, untreated, and uncontrolled HIV viral loads can range as high as one million or more copies/mL. A low viral load is usually between 40 to 500 copies/mL, depending on the type of test used. This result indicates that HIV is not actively reproducing and that the risk of disease progression is low (taken from: www.labtestsonline.org).

was not seeing a psychiatrist (Tr. 278).  At least two mental RFC assessments conducted prior to Plaintiff's alleged disability onset date indicated that, despite his depression and substance abuse, Plaintiff could perform gainful activity (Tr. 133-34, 146).

Dr. Crane, Plaintiff's physician, regularly saw Plaintiff in 2004 and oversaw Plaintiff's treatment (*e.g.*, Tr. 345, 349, 457, 458).  Some of these treatment notes make no mention of diarrhea (*e.g.*, Tr. 457, 458).  Others, such as that documenting a doctor's visit on May 24, note that Plaintiff's antiretroviral therapy resulted in cramping and diarrhea, but noted examination was otherwise unremarkable (Tr. 345).  According to a treatment note from August 5, Plaintiff was 85% adherent to his treatment regimen; his viral load was 175,000 (Tr. 457).

Plaintiff also underwent consultative examinations in 2004.  Dr. F. Qadir, a psychiatrist, examined Plaintiff in May (Tr. 341-43).  Plaintiff admitted to Dr. Qadir that he last drank alcohol the day before the examination and used crack once a month (Tr. 341).  He also disclosed a  history of abusing mescaline, Valium, and heroin (Tr. 341).  While Plaintiff complained of disturbed sleep and decreased appetite on account of depression, he indicated that he had never been admitted to a psychiatric hospital or seen a therapist or psychiatrist (Tr. 341).  Dr. Qadir diagnosed major depression as well as alcohol and cocaine abuse (Tr. 343).  A mental RFC assessment conducted in June 2004 again concluded that Plaintiff could perform simple tasks on  a sustained basis (Tr. 162-64).

Also in June 2004, Dr. E. Montasir performed a consultative examination (Tr. 354-56). Plaintiff reported to Dr. Montasir that he drank one-half pint of vodka weekly and last used crack the week before the examination (Tr. 354).  Plaintiff also told Dr. Montasir that he had lost 40 pounds over the last year to 18 months but that his weight was now stable at 162 pounds (Tr. 355). The doctor noted that Plaintiff had shingles but did not have any AIDS-identifying diseases, and also noted that Plaintiff had never been hospitalized (Tr. 355).  Plaintiff's CD4 count was 138 and stable

-7-

(Tr. 355).  Plaintiff complained of chronic fatigue, which Dr. Montasir thought might have been due to a combination of HIV and hepatitis B (Tr. 355).  The examination was otherwise unremarkable (Tr. 355).

Dr. Crane continued to treat Plaintiff in 2005.  In July, he noted that Plaintiff continued to drink alcohol "very heavily" and noted that Plaintiff admitted to smoking crack cocaine two months earlier (Tr. 453).  Plaintiff stopped ART therapy for some time, as Dr. Crane noted that Plaintiff had been on antiretroviral therapy for only the last three months (Tr. 453).  Physical examination revealed a normal abdomen and Dr. Crane did not make any notations regarding diarrhea (Tr. 453).  On September 2, 2005, Plaintiff complained to Dr. Crane of scrotal pain (Tr. 456).  Dr. Crane noted pursuant to a September 20, 2005 examination that Plaintiff had no  complaints arising from HIV and that Plaintiff was responding to treatment (Tr. 452).  The doctor noted  Plaintiff was 95% compliant with treatment and that his CD4 count was up to 253, and his viral load down to 550 (Tr. 452).

On September 27, 2005, a physician completed a Medical Assessment of Ability to Do Work Related Activities (Tr. 358-59).   According to this assessment, Plaintiff could stand/walk for two hours total, 40 minutes at a time without interruption, and could sit for two hours without interruption but does not specify a daily maximum for sitting (Tr. 358).  The assessment indicates Plaintiff was limited in how much he could lift or carry, but specifies no weight restrictions (Tr. 358).  The doctor indicated these limitations were due to Plaintiff's fatigue, diarrhea, scrotal pain, and depression (Tr. 358).  The doctor also imposed postural and environmental restrictions because of Plaintiff's fatigue and HIV (Tr. 359)

In October 2005, Dr. Edward Roberts, a psychologist, completed a Mental Impairment Questionnaire (Tr. 367-75).  Dr. Roberts noted that he had intermittent contact with Plaintiff over the years and last saw him on October 5, 2005 (Tr. 367).  Dr. Roberts indicated diagnoses of bipolar

disorder with psychotic features and panic disorder (Tr. 367). He noted Plaintiff had decreased concentration and severe anxiety, and was prone to sudden panic attacks (Tr. 368-70, 372). He also noted that Plaintiff had participated in individual therapy and took psychotropic medication (Tr. 369). Dr. Roberts believed Plaintiff had moderate to marked restrictions in activities of daily living, moderate to marked difficulties in maintaining social functioning, and moderate to marked difficulties in maintaining concentration, persistence, or pace (Tr. 373). He indicated Plaintiff had experienced frequent to constant episodes of decompensation (Tr. 373). Dr. Roberts opined that substance abuse had only "minimal influence" on Plaintiff's limitations (Tr. 374).

Plaintiff continued to see Dr. Crane in 2006. Dr. Crane recorded Plaintiff's weight on April 13, 2006 at 181 pounds (Tr. 450). The doctor made no notation regarding any diarrhea on this visit or at a follow up appointment on April 27 (Tr. 448-49, 450-51). Plaintiff complained of fatigue to Dr. Crane on May 18, 2006; the doctor's notes indicate Plaintiff had diarrhea the previous week but it had resolved (Tr. 446). Plaintiff was not on antiretroviral medication at this time, and the doctor indicated he would start Plaintiff on a new drug treatment for HIV (Tr. 446-47).

Dr. Crane again saw Plaintiff on September 26, 2006, at which time he noted that Plaintiff's medication was efficacious: "Excellent response to ART" (Tr. 443). Plaintiff complained of "some" diarrhea that resolved over the day, and he reported having a good appetite (Tr. 443). Plaintiff's weight had increased to 214 pounds; his CD4 count was 208 and his viral load was under 50 (Tr. 443). Dr. Crane noted Plaintiff had no new complaints (Tr. 443). Plaintiff again told Dr. Crane he had no complaints at a December 7, 2006 visit, at which time Dr. Crane noted Plaintiff's energy level had been improving (Tr. 440).

Plaintiff complained to Dr. Crane of diarrhea on February 7, 2007 (Tr. 436), but Dr. Crane noted that by March 2, 2007 it had resolved (Tr. 437). By then, Plaintiff's weight had increased to 220 pounds and Plaintiff had no physical complaints (Tr. 436).

Dr. Montasir conducted another consultative examination in May 2007 (Tr. 414-16).  He noted that Plaintiff's CD4 count was 200, which he considered an improvement (Tr. 414).  Plaintiff continued to complain of diarrhea but had no accompanying weight loss; Dr. Montasir felt fatigue was Plaintiff's "main problem" (Tr. 414-15).  Plaintiff told the doctor he last used alcohol in December 2005 (Tr. 414).  Dr. Montasir also completed a Medical Source Statement of Ability to Do Work-Related Activities (Tr. 417-22).  Dr. Montasir indicated that Plaintiff could lift up to 50 pounds frequently and carry up to 20 pounds frequently (Tr. 417).  He could sit up to eight hours, stand up to three hours, and walk up to two hours without interruption (Tr. 418).  Dr. Montasir believed Plaintiff could stand eight hours in an eight-hour day and walk for two hours in an eight-hour day (Tr. 418).  He attributed the walking limitations to Plaintiff's diarrhea (Tr. 418).  Dr. Montasir found no limitations in Plaintff's use of his hands or feet (Tr. 419).  He believed Plaintiff could climb, balance, stoop, and kneel frequently, and crouch and crawl occasionally (Tr. 420).  He imposed no environmental limitations (Tr. 421).

Nick Boneff, Ph.D., also conducted a consultative examination in May 2007 (Tr. 425-28).  Dr. Boneff noted that Plaintiff denied any history of psychiatric hospitalization but was in outpatient therapy (Tr. 426).  He also noted that Plaintiff had been incarcerated in December 2005 for check fraud (Tr. 426).  Dr. Boneff diagnosed alcohol abuse, in reported remission; crack cocaine abuse, in reported remission; and antisocial personality disorder (Tr. 428).

In a letter dated July 17, 2007, Dr. Crane explained that Plaintiff had been HIV positive since 1986 (Tr. 485).  He noted that Plaintiff also experienced thrombocytopenia, shingles, recurrent sino-bronchial disease, and bilateral lower extremity peripheral neuropathy (Tr. 485).  Plaintiff's major complaints were only fatigue and diarrhea (Tr. 485).  Immodium helped lessen the diarrhea (Tr. 485).  Dr. Crane felt Plaintiff's compliance with medication had been excellent since early 2006, and he noted Plaintiff had reported no drug use since December 2005 (Tr. 485).

Also in July 2007, Dr. Sudhir Lingnurkar completed an RFC assessment (Tr. 486).  Dr. Lingnurkar did not did not offer an opinion whether Plaintiff could work or, if he could work, to what kind of work he would be limited.  He completed a one-page form in which he checked various boxes corresponding to the degree to which he believed Plaintiff was limited in various mental activities; he found Plaintiff had no limitations in some areas, no significant limitations in other areas, moderate limitations in still others, and, in a few areas, marked limitations (Tr. 486).

### C.      Plaintiff's Claims of Error

Plaintiff advances three arguments on appeal: (1) that the ALJ misapplied the  "treating physician rule" when weighing the medical evidence; (2) that the ALJ failed to apply the correct analysis to determine the effect of Plaintiff's drug and alcohol abuse on his impairments; and (3) that the ALJ incorrectly determined that Plaintiff's HIV was not severe enough to meet a Listing-level impairment.[4]

## III.    DISCUSSION

### A.      Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

---

[4]  Any other objections to the ALJ's decision have been waived, as Plaintiff did not raise them in his motion for summary judgment.  *See Brainard v. Secretary of Health and Human Serv's.*, 889 F.2d 679, 681 (6th Cir. 1989).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*).

-13-

Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).  While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

-14-

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    Analysis and Conclusions

As noted earlier, Plaintiff raises three arguments on appeal:  (1) that the ALJ misapplied the "treating physician rule" when weighing the medical evidence; (2) that the ALJ failed to apply the correct analysis to determine the effect of his drug and alcohol abuse on his impairments; and (3) that the ALJ incorrectly determined that Plaintiff's HIV was not severe enough to meet the Listings.  Each argument is addressed below:

### 1.    The ALJ Properly Considered The Medical Evidence

First, Plaintiff argues that the ALJ failed to properly weigh the medical evidence.  Specifically, Plaintiff avers that the ALJ failed accurately to assess Dr. Roberts' opinions and failed to give a good reason for not giving them controlling weight (Pl. Br. at 4-6).  Plaintiff contends that the ALJ improperly rejected the opinions because Dr. Roberts failed to acknowledge Plaintiff's substance abuse (*Id*. at 4-5).  Plaintiff notes that Dr. Roberts explicitly determined that Plaintiff's

substance abuse had "minimal influence" on his limitations and acknowledged that Plaintiff had been

"guilty at times of using substances to self-medicate" (*Id*. at 5).

Defendant responds that Plaintiff accurately cites these portions of Dr. Roberts' report, but

that the ALJ still correctly applied the treating physician rule and gave good reasons for rejecting Dr.

Roberts' opinions.   Defendant is correct.   The ALJ appropriately recognized that Dr. Roberts

significantly underestimated Plaintiff's extensive history of drug abuse.   Plaintiff did more than

"self-medicate" with "substances" "at times."   Plaintiff admitted to a life of alcohol abuse (Tr. 300),

started using powder cocaine at 19, and crack cocaine at 22 (Tr. 300).   In 2003, Plaintiff stated that

he spent $150 daily on crack (Tr. 298).   Furthermore, other medical sources agreed with the ALJ's

analysis of Dr. Roberts' opinion concerning Plaintiff's substance abuse.   Dr. Boneff, who conducted

a consultative psychological examination in May 2007, reviewed Dr. Roberts' report and noted that

Dr. Roberts made no mention of a substance abuse diagnosis (Tr. 426).   Dr. Boneff diagnosed

alcohol abuse, in reported remission, and crack cocaine abuse, in reported remission (Tr. 428).

The ALJ also presented other good reasons for rejecting Dr. Roberts' opinion.   Dr. Roberts

diagnosed bipolar disorder with psychotic features and panic disorder (Tr. 368) and noted that

Plaintiff took psychotropic medication (Tr. 369).   As the ALJ noted, these conclusions find no

support in the record.   The record documents repeated diagnoses of depression, not bipolar disorder.

Other mental health providers also contradict Dr. Roberts by explicitly noting that Plaintiff did not

display psychotic symptoms (Tr. 133, 215, 280, 343).   Plaintiff himself repeatedly denied psychiatric

hospitalization (Tr. 214, 278, 341, 426).   The ALJ "is not bound by conclusory statements of doctors,

particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*

*v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x

336, 340 (6th Cir. 2008).   In short, the ALJ correctly concluded that Dr. Roberts' opinions were not

supported by medical signs and laboratory findings and were inconsistent with the medical record

as a whole. Thus the ALJ properly applied the "treating physician rule" when he did not give Dr. Robert's opinions controlling weight.

Plaintiff also argues that remand is required because the ALJ failed to mention Dr. Lingnurkar, whom Plaintiff describes as a treating psychiatrist (Pl. Br. at 4). Defendant acknowledges that the ALJ did not mention any opinion from this doctor, but argues that this omission is harmless error. Defendant is correct. First, it is well-settled that an ALJ need not cite and discuss every piece of evidence in the record. *See, e.g., Walker v. Sec'y of Health & Human Serv's.*, 884 F.2d 241, 245 (6th Cir. 1989). The Commissioner's decision will be affirmed so long as the record as a whole supports it. *See Newton v. Sec'y of Health & Human Serv's.*, 1992 WL 162557 at *2 (6th Cir. July 13, 1992). Second, Defendant correctly notes that Dr. Lingnurkar did not render any meaningful opinion. The only document in the record from Dr. Lingnurkar is a one-page mental RFC assessment (Tr. 486). This assessment has limited utility as it does not contain any explicit opinion whether Plaintiff could perform work-related activities. Dr. Lingnurkar found Plaintiff to have marked limitations in some areas of functioning, only mild limitations in others, no significant limitations in yet others, and even no limitations at all in some areas (Tr. 486).

Lastly, Plaintiff claims that the ALJ improperly asserted that Dr. Crane "did not address the question of disability" (Pl. Br. at 7). However, the ALJ never made such a broad statement. Referring to a letter dated July 17, 2007, the ALJ noted, "Dr. Crane did not opine that [Plaintiff's] ongoing symptoms preclude him from performing any gainful activity" (Tr. 36). Indeed, nowhere in the quoted text does Dr. Crane opine whether Plaintiff could perform work (Pl. Br. at 7). Thus, the ALJ did not misstate Dr. Crane's opinion.

In sum, the ALJ correctly evaluated the medical evidence and substantial evidence supports a finding that Plaintiff retained the capacity to perform unskilled sedentary work.

### 2. The ALJ Properly Addressed Plaintiff's Drug & Alcohol Abuse

Plaintiff next claims the ALJ found him not to be disabled on account of his drug and alcohol addiction and "turned the legal analysis upside down" by focusing too much on Plaintiff's drug use and "not addressing the question of [Plaintiff's] disability" (Pl. Br. at 9-10). Defendant responds that Plaintiff overstates the consideration the ALJ gave to drug and alcohol addiction in the disability determination. Defendant is correct. The ALJ noted that record evidence suggested Plaintiff finally abstained from abusing alcohol and illegal drugs by 2006 (Tr. 35, 36). Yet, the ALJ still found that Plaintiff had severe impairments, and his RFC finding clearly shows the ALJ believed those impairments resulted in significant limitations, even after Plaintiff had stopped abusing drugs and alcohol. The ALJ recognized Plaintiff could not perform past work and limited Plaintiff to unskilled sedentary work (Tr. 37-38). The ALJ further explained that he recounted Plaintiff's alcohol and substance abuse because it negatively reflected on Plaintiff's credibility (Tr. 35).

In 1996, the Social Security Act was amended to provide that "[a]n individual shall not be considered disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The Commissioner implemented this standard by enacting 20 C.F.R. §§ 404.1535 and 416.935, which "clearly" require that the five step sequential evaluation process, found in 20 C.F.R. § 404.1520, be followed in the adjudication of disability "before any consideration is given to whether drug addiction [or alcohol abuse] is the cause of such disability." *Williams v. Barnhart*, 338 F.Supp.2d 849, 862 (M.D. Tenn. 2004) (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001)). *See also Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003); *Wilby v. Astrue*, 2010 WL 2802713, at *9 (N.D. Ohio May 20, 2010); *Goins v. Astrue*, 2010 WL 55687, at *5 (N.D. Ohio Jan.4, 2010). Thus, "[t]o find that drug addiction

is a contributing factor material to the determination of disability without first finding the [plaintiff] disabled ... is to put the cart before the horse." *Williams*, 338 F.Supp.2d at 862.

If the five step sequential evaluation process, without removing the effects of substance abuse disorders from consideration, indicates that the plaintiff is not disabled then there is no need to continue with the substance abuse materiality analysis of 20 C.F.R. §§ 404.1535 and 416.935. *Brueggemann*, 348 F.3d at 694-95 ("If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent."); *see also Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Williams*, 338 F.Supp.2d at 863. Once the gross total of the plaintiff's exertional and non-exertional limitations, including the effects of his substance abuse, reveal that the plaintiff is disabled, the adjudicator must determine whether his substance abuse is a "contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a).

The key factor in determining whether the plaintiff's substance abuse is a contributing factor material to his disability is whether he would still be disabled if he stopped using drugs or alcohol. *See* 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). To make that determination, the ALJ must "evaluate which of [the plaintiff's] current physical and mental limitations, upon which [he] based [his] current disability determination, would remain if [the plaintiff] stopped using drugs or alcohol and then determine whether any or all of [the plaintiff's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2)(i)-(ii). If the plaintiff's remaining limitations are not disabling, then his substance abuse is a "contributing material factor to the determination of disability," but if the remaining limitations are disabling, then his substance abuse is not a "contributing material factor to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(i)-(ii), 416.935(b)(2)(i)-(ii).

Here, the ALJ found that Plaintiff was not disabled, despite Plaintiff's long struggle with sobriety. Because Plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether drug abuse was material to a finding of disability. Thus, Plaintiff's second argument on appeal has no merit.

### 3. Plaintiff's HIV Did Not Meet The Listings

Finally, Plaintiff argues that the ALJ erred by not finding that Plaintiff's HIV met Listing-level severity (Pl. Br. at 10-14). In order to establish disability under the Listings, each requirement of the applicable Listing must be met. *See* 20 C.F.R. §§ 404.1525(d) and 416.925(d) ("We will not consider your impairment to be one listed in appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment"); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria").

Plaintiff makes two arguments to support his claim that his HIV met or equaled a listed impairment. First, he notes that his CD4, or T-cell count often dipped below 200, and quotes a portion of the decision in which the ALJ notes Plaintiff had CD4 counts of 175 and under (Pl. Br. at 10) (citing Tr. 35). Plaintiff further cites Mr. Gaines' testimony that a doctor at Ford Motor Company would not let Plaintiff work because his CD4 count was below 200 (*Id*. at 11). While Mr. Gaines may have accurately explained Ford's internal policy, the Social Security regulations do not mirror Ford's preclusion of work when a claimant's CD4 count dips under 200. The ALJ quoted a provision from the Listings explaining how the Agency determines Listing-level severity for HIV; the ALJ accurately noted that the regulations are clear that a low CD4 count is alone insufficient to meet the HIV Listing (Tr. 35). The HIV Listing explains, "[A] reduced CD4 count alone does not establish a definitive diagnosis of HIV infection, or document the severity or functional consequences of HIV infection." 20 C.F.R. Ch. III, Pt. 404, Subpt. P. App. 1

§14.00(F)(2).  The regulations explain that a low CD4 count increases susceptibility to opportunistic disease.  *See id.*  Plaintiff's medical records, however, do not document treatment for any opportunistic infection or disease.  Plaintiff received his diagnosed of hepatitis B in 1983, before he tested HIV positive (Tr. 201).  While Plaintiff was diagnosed with shingles in 1994, no doctor linked Plaintiff's shingles to HIV (Tr. 201).  Indeed, Dr. Montasir noted Plaintiff's shingles but simultaneously noted no "AIDS identifying" diseases (Tr. 355).  Thus, it does not appear that the ALJ committed any error based upon Plaintiff's sub-200 CD4 count.

Citing his diarrhea and weight loss, Plaintiff next argues that he met Listing 14.08(H)(1) – HIV wasting syndrome (Pl. Br. at 12).  However, Defendant points out that the bulk of Plaintiff's weight loss occurred before his alleged disability onset date.  In June 2004, Plaintiff told Dr. Montasir that he had lost 40 pounds over the last 12 to 18 months; Dr. Montasir noted Plaintiff's weight of 162 pounds (Tr. 355).  Plaintiff's weight then increased as his treatment progressed.  Dr. Crane noted on April 13, 2006, that Plaintiff weighed 181 pounds (Tr. 450).  By March 2, 2007, Plaintiff weighed 220 pounds (Tr. 436).  The ALJ noted that standing 5'6", at 227 pounds, by May 2007 Plaintiff was obese (Tr. 36) (citing Tr. 415).  In sum, the ALJ properly determined that Plaintiff's HIV was not severe enough to meet the Listings.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*,

932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).

The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon_____
Mark A. Randon
United States Magistrate Judge

Dated:  July 25, 2011

### CERTIFICATE OF SERVICE

*I hereby certify that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 25, 2011.*

s/Melody R. Miles_____
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*